UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL GONZALES,<br><br>            Plaintiff,<br><br>      v.<br><br>GONZALES, et.al.,<br><br>            Defendants. | Case No.: 1:19-cv-00459-NONE-SAB (PC)<br><br>FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANT GONZALEZ'S MOTION FOR SUMMARY JUDGMENT<br><br>(ECF No. 55) |

Plaintiff Michael Gonzales is appearing *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983.

Currently before the Court is Defendant Gonzalez's motion for summary judgment, filed on May 4, 2021.

**I.**

**RELEVANT BACKGROUND**

This action is currently proceeding against Defendant Gonzalez for providing Plaintiff with food tainted with involuntary antipsychotic medication without a Keyhea order in violation of the Due Process Clause of the Fourteenth Amendment.

On March 2, 2020, Defendant Gonzalez filed an answer to the complaint. (ECF No. 26.)

On March 3, 2020, the Court issued the discovery and scheduling order. (ECF No. 29.)

On September 29, 2020, the Court issued an amended discovery and scheduling order. (ECF No. 52.)

On May 4, 2021, Defendant Gonzalez filed the instant motion for summary judgment. (ECF No. 55.)

On June 9, 2021, Defendant filed a declaration in lieu of a reply as Plaintiff did not file a timely opposition. (ECF No. 58.)

On July 6, 2021, Plaintiff filed an untimely opposition to Defendant's motion. (ECF No. 59.)

On July 12, 2021, Defendant filed a reply to Plaintiff's opposition. (ECF No. 60.)

## II.

## LEGAL STANDARD

### A.   Summary Judgment Standard

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d at 942 (quotation marks and citation omitted).

In arriving at these Findings and Recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## III.

## DISCUSSION

### A. Summary of Plaintiff's Allegations in Complaint[1]

Plaintiff alleges in May 2018, correctional officer Gonzalez illegally medicated his meals with antipsychotic medication to cause Plaintiff pain and suffering. Plaintiff alleges that Gonzalez placed the medication--in a white powder format--into his food as he distributed it.  After meals, Plaintiff develops symptoms such as burning of the lining of his throat, tongue irritation, extreme nausea, headache, blurry vision, involuntary muscle spasms, grimacing, loss of memory, dry mouth, chest pain, excessive sleep, acidic saliva, irregular heartbeat, extreme agitation, and anger.

### B. Statement of Undisputed Facts[2]

1. At all times relevant to the complaint, Plaintiff was a state prison incarcerated at Kern Valley State Prison (KVSP), within the custody of the California Department of Corrections and Rehabilitation (CDCR).  (Compl. at 1, ECF No. 1; Declaration of J. Gonzalez ("Gonzalez Decl.") ¶ 5.)[3]

2. Plaintiff believes that CDCR staff throughout the state of California have been

---

[1] On September 28, 2020, the Court dismissed all claims, without prejudice, for failure to exhaust the administrative remedies, except Plaintiff's claim against Defendant Gonzalez based upon incidents that allegedly took place prior to May 28, 2018.  (ECF No. 51.)

[2] Hereinafter referred to as "UF."

[3] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

involuntarily medicating his food with anti-psychotic medications since 1983. (Deposition of Plaintiff (Pl. Dep.) at 24:5-21, 73:24-74:9.)

3. Plaintiff filed numerous previously lawsuits alleging staff were illegally medicating his food. None of those lawsuits resolved in Plaintiff's favor. (Pl. Dep. at 37:5-12, 42:24-43:3.)

4. Plaintiff was housed on Facility C, Building 1, A Pod at all times relevant to this lawsuit in May 2018. (Gonzalez Decl. ¶ 5.)

5. At all times relevant to this lawsuit, the Facility C1 at KVSP was a Sensitive Needs Yard (SNY). The inmates living in this unit were classified as level-four maximum custody inmates, which is the highest level of security in CDCR. Generally, inmates housed in SNY have special circumstances as to why they cannot safety house in general population. These inmates are often gang drop outs, have been convicted of sex crimes, have enemies in general population, or may even be former law enforcement which may subject them to assault if housed in general population. Therefore, they are ineligible for housing in general population. (Gonzalez Decl. ¶ 6.)

6. Plaintiff has a history of gastroesophageal reflux disease, or GERD. GERD is a digestive disorder that affects the lower esophageal sphincter, which is the ring of muscle between the esophagus and stomach. The most common symptom of GERD is heartburn or acid indigestion which feels like a burning chest pain beginning behind the breastbone and moving upward to the neck and throat. (Declaration of Dr. O. Del Pilar (Del Pair Decl.) ¶ 6; Declaration of Dr. N. Igbinosa (Igbinosa Decl.) ¶ 6.)

7. To ease the symptoms of GERD, physicians at KVSP and Plaintiff's prior providers have prescribed and renewed a prescription for Mintox chewable tablets, an antacid, which Plaintiff has been prescribed for years. (Del Pair Decl. ¶ 7; Igbinosa Decl. ¶ 7; Pl. Dep. at 50:8-13.)

8. Prior to Plaintiff's arrival at KVSP, on June 22, 2017, he received an esophagogastroduodenoscopy (EGD). An EGD is diagnostic minimally invasive endoscopic procedure that visualizes the upper part of the gastrointestinal tract down to the duodenum. An evaluation of the results of the EGD showed that Plaintiff had mild esophagitis, which is an inflammation of the lining of the esophagus. Irritation leading to esophagitis may be caused by GERD. These results would have been provided to Plaintiff at the time. (Del Pair Decl. ¶ 8.)

4

9. The EGD shows that Plaintiff had mild esophagitis, which is consistent with his history of GERD. Neither esophagitis or GERD are correlated with ingesting Cogentin, Thorazine, Haldol, or other psychotropic medications. (Del Pair Decl. ¶ 10.)

10. There were no orders for Haldol, Thorazine, and/or Cogentin that were received, processed, or dispensed for Plaintiff from the KVSP pharmacy between May 1, 2018 and May 28, 2018, in any format. (Declaration of S. Chatterjee (Chatterjeee Decl.) ¶ 7; Del Pilar Decl. ¶ 11; Pl. Dep. at 46:9-14.)

11. Plaintiff's medical records throughout 2018, indicate he did not complain to medical staff of any of the common or severe adverse reactions to Haldol, Thorazine, or Cogentin, nor did any medical staff observe any of these reactions when they evaluated him. (Del Pilar Decl. ¶ 15.)

12. Plaintiff often submits medical request forms, and did so throughout 2018. He complained of issues related to shoulder pain, hip and back pain, generalized pain complaints, an injury to his left hand, and he requested regular check-ups and refills of his Mintox tablets. (Del Pair Decl. ¶ 16; Igbinosa Decl. ¶ 10; Declaration of D. Gutierrez (Gutierrez Decl.), Ex. A.)

13. Plaintiff only raised the issue of staff (officer Maraquin) medicating his meals once, on April 9, 2018. Plaintiff also requested new shoes in this request. Plaintiff did not raise any physical ailments which he attributed to the alleged food medicating. However, when seen following this request, Plaintiff did not discuss the alleged food medication and focused on his Hepatitis C treatment. He also reported no confusion, fatigue, headaches, muscle or joint weakness, lightheaded or dizziness, convulsions, tremors, or paralysis. The same is true for Plaintiff's appointments throughout April and May 2018. (Del Pair Decl. ¶ 17; Igbinosa Decl. ¶ 11; Gutierrez Decl., Ex. A.)

14. Plaintiff has a history of substance abuse, including cocaine, hallucinogens/LSD, marijuana, PCP, and heroin. Abuse of these drugs can lead to paranoia and delusions even years after ingesting them. (Del Pair Decl. ¶ 18; Igbinosa Decl. ¶ 12; Pl. Dep. at 21:16-23:22.)

15. Tardive Dyskinesia (TD) is a side effect of antipsychotic medications. These drugs are used to treat schizophrenia and other mental health disorders. TD causes stiff, jerky movements of the patient's face and body that they can't control. A patient might blink his eyes, stick out his tongue, or

wave his warms without meaning to do so.  TD does not cause vision loss.  (Del Pair Decl. ¶ 19; Igbinosa Decl. ¶ 15.)

16. Throughout 2018, including the relevant time period in May of 2018, Plaintiff did not present with any symptoms of TD, nor did he complain of any associated symptoms.  (Del Pair Decl. ¶ 20; Igbinosa Decl. ¶ 16.)

17. Plaintiff cannot identify any specific dates in May 2018 that he alleges Defendant Gonzalez medicated his food.  (Pl. Dep. at 56:11-57:2.)

18. Plaintiff alleges Gonzalez mediated his foods with Thorazine crushed up into a white powder while located in the rotunda.  (Pl. Dep. at 57:16-59:2.)

19. Plaintiff cannot see the rotunda area where he alleges Gonzalez medicated his food when he is inside his cell.  (Pl. Dep. at 67:3-68:4.)

20. Plaintiff believes his foods are being medicated with Thorazine and Cogentin.  Both in a white powder form.  (Pl. Dep. at 70:7-19.)

21. Plaintiff claims these medications cause him to feel nauseous, have blurry vision, have involuntary muscle movement, get headaches, feel lethargic, have short term memory loss, and cause acid indigestion (burning to throat and tongue) after he consumes them in his food.  (Pl. Dep. at 11:17-23, 52:2-9, 70:23-71:7, 80:18-22.)

22. Plaintiff believes medical staff inject his antacid tablets with antipsychotic medications, but has never seen anyone do it.  (Pl. Dep. at 50:10-51:25.)

23. All medication orders issued by KVSP medical staff for inmates housed at KVSP are processed and dispensed solely through the pharmacy at KVSP.  (Chatterjee Decl. ¶ 7; Pl. Dep. at 52:18-25.)

24. Mintox has very rare side effects and is generally safe and side effect-free.  On rare occasion, about 10% of patients complained of gastrointestinal side effects, particularly constipation, decreased gastrointestinal motility, fecal impaction, hemorrhoids, stomach cramps, and/or an unpleasant chalky taste.  Approximately 1% to 10% of patients report fecal discoloration (white speckles), nausea, and/or vomiting.  Less than 1% of patients complaint of dehydration, fluid

retention, hypomagnesemia, and/or hypophosphatemia.  Generally, these side effects are mild and are not severe enough for the patient to discontinue use.  (Igbinosa Decl. ¶ 8.)

25. Antacids like Mintox may interfere with the absorption of phenothiazine antipsychotic medications like Thorazine, making them less effective.  Therefore, dosing will need to be accommodated to account for this, or the antacids may be discontinued as necessary.  (Igbinosa Decl. ¶ 9.)

26. In addition to the Mintox tables, during May 2018, Plaintiff was also prescribed (Mavyret 100mg-40mg) beginning in April 2018.  This oral medication is for the treatment of Hepatitis C.  The most common side effects are headache, tiredness, nausea, diarrhea, and weakness/lack of energy.  Mavyret is not recommended for patients with advanced liver problems as there is a rare risk of worsening liver problems, liver failure, and even death.  Hepatitis C is a liver infection caused by a germ that can spread through blood or other bodily fluids.  As a result of having Hepatitis C and undergoing treatment with Mavyret in May 2018, Plaintiff was likely to experience fatigue, weakness, loss of appetite, and/or nausea.  Plaintiff did report mild but tolerable, nausea associated with Mavyret.  If Plaintiff experienced headache, tiredness, nausea, diarrhea, and/or weakness/lack of energy during May 2018, the likely cause was his Hepatitis C treatment, Mavyret.  Anti-psychotic medications to not cause Hepatitis C.  (Igbinosa Decl. ¶ 13; Pl. Dep. at 47:15-48:9.)

27. Plaintiff was also prescribed Tamsulosin on May 19, 2018, however, he refused this medication.  Tamsulosin is used to treat men with an enlarged prostate (benign prostatic hyperplasia-BPH).  (Igbinosa Decl. ¶ 14.)

28. Plaintiff was also prescribed Prilosec oral tablets on May 20, 2018.  Prilosec is also used to treat acid reflux.  (Igbinosa Decl. ¶ 14.)

29. Haldol, or haloperidol, is an antipsychotic medication used in the treatment of schizophrenia, Tourette's syndrome, and other indications.  During the relevant time period, KVSP purchased and received this drug in small orange, yellow, pink or green round or oblong tables, clear oral liquid, or a clear liquid injectable form.  (Chatterjee Decl. ¶ 8.)

30. Common adverse reactions of Haldol include insomnia, anxiety, drowsiness, lethargy,

7

weight changes, photosensitivity, involuntary movements, swelling of breast tissues, menstrual irregularities, milk secretion from the breast, and impair body temperature regulation.  Serious adverse reactions of Haldol include serious involuntary moments or spasms, heat strike, pneumonia, low blood pressure, dry mouth, sudden death, seizures, hepatic impairment, blood cell deficiencies, cataracts, retinopathy, abnormal heart rhythm.  (Del Pair Decl. ¶ 14.)

31. Thorazine, or chlorpromazine, is an antipsychotic medication used in the treatment of schizophrenia and other indications.  During the relevant time period, KVSP purchased and received this drug in small round, brown coated tables, and a clear liquid injectable form. (Chatterjee Decl. ¶ 9.)

32. Common adverse reactions of Thorazine include drowsiness, law blood pressure, blurred vision, dry mouth, constipation, urinary retention, nausea, nasal congestion, agitation, insomnia, involuntary movements, high levels of prolactin, sexual dysfunction, weight gain, high levels of fat in blood, ocular pigmentation, skin pigmentation, jaundice, photosensitivity, and impaired body temperature regulation.  Serious adverse reactions of Thorazine include involuntary body movements, neuroleptic malignant syndrome, blood disorders, blood cell deficiencies, low blood pressure, prolonged erection, seizures, hypersensitivity, abnormal heart rhythm, allergic reaction, dermatitis, and heat stroke.  (Del Pair Decl. ¶ 13.)

33. Cogentin, or benztropine mesylate, is used to treat Parkinson's disease or involuntary movements due to the side effects of certain psychiatric drugs such as Thorazine or Haldol, and other indications.  During the relevant time period, KVSP purchased and received this drug in small, white round or oblong tablets, and a clear liquid injectable form.  (Chatterjee Decl. ¶ 10.)

34. Common adverse reactions of Cogentin include constipation, urinary retention, dry mouth, sedation, fast heartbeat, shortness of breath, itching, nausea, vomiting, flatulence, anorexia, abdominal pain, rash, dizziness, headache, nervousness, ear ringing, swollen limbs, and blurred vision.  Serious adverse reactions of Cogentin include abnormal heart rhythm, psychosis, and heat stroke.  (Del Pilar Decl. ¶ 12.)

35. Haldol, Thorazine, and Cogentin do not exist, nor are they administered, in a white format at KVSP.  Even though Cogentin may come in a white table, it is not a drug that is ordered to be crushed prior to administration to a patient.  It is common practice for this medication to be

provided in the tablet form and the KVSP lead pharmacist has never seen it ordered in crushed format. (Chatterjee Decl. ¶ 12.)

36.     If the tablets were ordered by the prescriber to be crushed prior to administering them, the psychiatric technician or nurse would crush the medication using a specialized machine kept under his or her control and custody.  The medical staff must be located in front of the inmate patient in order to open the medication and crush it.  If crushed, the medication powder is placed in a small cup and floated in water and immediately provided to the inmate patient.  This all takes place in front of the inmate patient and must be immediately provided to the inmate patient.  If an inmate patient refuses to take the crushed and floated medication, it is immediately disposed of per policy and procedure.  Powdered forms of the medication are never transferred throughout the institution, provided to custody staff, or placed in bags.  (Chatterjee Decl. ¶ 13.)

37.     The drugs obtained in clear liquid injectable form (Haldol, Thorazine, or Cogentin) would only be effective if injected directly into a patient.  The medications would not be effective if injected into antacids or food and later consumed.  This is because they must be injected subcutaneously, intramuscularly, or intravenously, otherwise the intended dose would not be optimal. This is because the acids and chemicals in your stomach would interact with the medication in a manner which would decrease their effectiveness.  Doses given orally must be adjusted for effectiveness.  (Chatterjee Decl. ¶ 14.)

38.     Haldol, Thorazine, and Cogentin are solely handled and administered by nursing staff, including psychiatric technicians or nurses as ordered by the prescriber.  They are not handled or administered by correctional staff.  (Chatterjee Decl. ¶ 15.)

39.     At all times relevant to the complaint, Defendant Gonzalez was a correctional officer at KVSP who rotated shifts between buildings.  One of his rotations was as a floor officer C Yard Building 1 two days a week on second watch from 6:00 a.m. to 2:00 p.m. (Sunday and Monday). (Gonzalez Decl. ¶ 4.)

40.     Floor officers were generally responsible for facilitating the daily routine of SNY inmates, including feeding, maintaining the safety and security of the unit, and supervising the inmates and their movement within the unit.  A floor officer would also escort the psychiatric technician cell-

9

to-cell while he or she administered medications to the inmates, which was commonly referred to as a "med pass." (Gonzalez Decl. ¶ 7.)

41. Defendant Gonzalez would assist in passing out meals during meal time; however, he had no involvement in food preparation. The food is prepared in bulk by the kitchen staff in the main institution dining hall in a building that is not located in Facility C1. The food is then brought by inmates who work in the dining hall to the dining hall located in the building next to C1 where it is heated as necessary and placed on trays by inmate workers. The food is then delivered on carts by the inmate dining workers to the various surrounding housing units. Gonzalez has no involvement in this process. (Gonzalez Decl. ¶ 8; Pl. Dep. at 61:21-25.)

42. When the food arrives at the housing units, it is already portioned out on the individual trays, and the floor staff do not have anything to do with portioning the food. The cart is enclosed with approximately 15 sheet pans with appropriately four trays each. The individual trays are not covered. Gonzalez then opens up the carts and makes sure there are enough trays to feed the building and that they have the required trays for inmates who have specialty diets (Kosher, Vegetarian, Halal, etc.). (Gonzalez Decl. ¶ 9; Pl. Dep. at 60:15-61:25, 62:1-5.)

43. Lunches and breakfasts are delivered at the same time at approximately between 6:30 a.m. to 7:00 a.m. The breakfast trays consist of hot food items and prepackaged items. Lunches are a sack lunch and consist of all prepackaged sealed food items. This food comes from the vendor prepackaged. Nothing in the lunches is prepared at the institution. (Gonzalez Decl. ¶ 10; Pl. Dep. at 60:15-61:25.)

44. Generally, two officers go down each section of the tier and pass out meal trays—one officer will open and close the food port, and one officer will serve the meal tray to the inmate. (Gonzalez Decl. ¶ 11.)

45. Multiple officers are involved with the distribution of meal trays simultaneously throughout the facility, so all of the inmates receive their food in a timely and efficient manner. Because meal trays are stacked onto multiple, identical carts, there is no way to know with certainty which meal tray will be delivered to which inmate. (Gonzalez Decl. ¶ 12.)

46. After the meal trays were distributed, Defendant Gonzalez would assist in collecting and accounting for all trays in each section. (Gonzalez Decl. ¶ 13.)

47. Generally, either before or after the meal service, depending on the day, the psychiatric technician or nurse would begin passing out medications to inmates, which is referred to as "med pass." (Gonzalez Decl. ¶ 14.)

48. Medications and meals are not passed out to an inmate simultaneously. (Gonzalez Decl. ¶ 15.)

49. Either Gonzalez's partner or he would escort the medical staff on med pass. (Gonzalez Decl. ¶ 16.)

50. Gonzalez would open, close, and lock the food port door of the cell for each inmate who received medication, Gonzalez never had access to the medication cart, and never personally administered medication to an inmate. (Gonzalez Decl. ¶ 17.)

51. To Gonzalez's knowledge, the medical staff would only dispense medication to inmates that were prescribed via a physician's order. (Gonzalez Decl. ¶ 18.)

### C. Plaintiff's Untimely Opposition

Pursuant to Local Rule, Plaintiff had twenty-one days, plus three-days for mailing, from May 4, 2021, to oppose Defendant's motion for summary judgment Local Rule 230(l). However, Plaintiff did not constructively file his opposition until June 27, 2021. (ECF No. 59.)

There is no question that Plaintiff's opposition is untimely, and Defendant's argument on this point is recognized and well-taken. Nevertheless, the Court must weigh Plaintiff's obvious failure to adhere to this Court's deadlines against the Ninth Circuit's position that "a case should, whenever possible, be decided on the merits." Falk v. Allen, 739 F.2d 461, 463 (9th Cir. 1984). Given that the opposition *has* been filed and Defendant has filed a reply, the motion for summary judgment is deemed submitted for consideration on the merits, and Defendant has not identified any specific

11

prejudice if the motion to strike is denied.[4]  Accordingly, the Court will consider Plaintiff's opposition in ruling on the Defendant's motion for summary judgment.

### D. Analysis of Defendant's Motion

Defendant argues that none of the medications identified by Plaintiff existed in a white powder format, no one gave Defendant Gonzalez any medication to place in Plaintiff's food, Gonzalez did not prepare food for the inmates or have access to the medications, medications and meals were generally distributed at different times, and the alleged effects from the medications can be attributed to Plaintiff's history of gastroesophageal reflux disease (GERD) and Hepatitis C diagnosis and treatment.

As stated above, Plaintiff's claim is premised on his assertion that Defendant Gonzalez obtained Thorazine, Haldol, or Cogentin in a white powder form and placed it in his food in May 2018, which caused him to feel nauseous, have blurry vision, involuntary muscle movement, headaches, lethargy, short term memory loss and acid indigestion.  (UF 18, 20, 21.)

The U.S. Supreme Court has recognized a liberty interest in freedom from unwanted antipsychotic drugs.  Washington v. Harper, 494 U.S. 210, 221-22 (1990); United States v. Ruiz-Gaxiola, 623 F.3d 684, 691 (9th Cir. 2010).  For convicted inmates, or those awaiting trial, the "liberty interest in avoiding unwanted medication must be defined in the context of the inmate's confinement." United States v. Loughner, 672 F.3d 731, 745 (9th Cir. 2012) (quoting Harper, 494 U.S. at 222).  If it is determined that an inmate is a danger to himself or others, and that treatment is in his medical interest, the Due Process Clause allows the State to treat an inmate with serious mental illness with antipsychotic drugs against the inmate's will.  Harper, 494 U.S. at 227; see also Riggins v. Nevada, 504 U.S. 127, 135 (1992) ("Under Harper, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness.").  "In the context of both Harper and Riggins such an invasion of the human person can only be justified by a determination by a neutral factfinder that the antipsychotic drugs are medically appropriate and that the circumstances justify their application."  Kulas v. Valdez, 159 F.3d

---

[4] Nevertheless, Plaintiff is cautioned that even pro se litigants must read and comply the court rules and orders. Future violations of either may result in sanctions, including monetary sanctions or the dismissal of this action.

453, 456 (9th Cir. 1998).  In addition to the above substantive due process requirements, procedural due process forbids the forced administration of antipsychotic drugs "if there are no procedural safeguards to ensure the prisoner's interests are taken into account."  Id.

In California, in order to constitutionally medicate a prisoner for a substantial period of time with antipsychotic drugs against the prisoner's will, an official with the California Department of Corrections and Rehabilitation must obtain a Keyhea order.  "A Keyhea order permits the long-term involuntary medication of an inmate upon a court finding that the course of involuntary medication is recommended and that the prisoner, as a result of mental disorder, is gravely disabled and incompetent to refuse medication, or is a danger to himself or others."  Davis v. Walker, 745 F.3d 1303, 1306 n.2 (9th Cir. 2014); see also Keyhea v. Rushen, 178 Cal. App. 3d 526 (1986).

"The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Helling v. McKinney, 509 U.S. 25, 31 (1993).  Adequate food is a basic human need protected by the Eighth Amendment. Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982), (abrogated on other grounds by Sandin v. O'Connor, 515 U.S. 472 (1995)). While prison food need not be "tasty or aesthetically pleasing," it must be "adequate to maintain health." LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993).  However, extreme deprivations are required to make out a conditions of confinement claim, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citations and quotations omitted). To establish a violation of the Eighth Amendment, Plaintiff must submit evidence sufficient to show that prison officials knew of and disregarded a substantial risk of serious harm to the plaintiff. Farmer, 511 U.S. at 847.

It is undisputed that none of the three medications identified by Plaintiff existed in a white powder format.  (UF 35.)  Although Cogentin tablets could in theory have been crushed into a white powder—as KVSP purchased and received it in round or oblong white tablets—only medical staff had access to the specialized machine used to crush the medication into a powder form.  (UF 33, 36.)  Both Haldol and Thorazine were not purchased in a format that allowed it to be crushed into a white powder.  (UF 29, 31, 35.)  Despite Plaintiff's conclusory contention, Defendant Gonzalez never

received any medication, in white powder or otherwise, to administer to Plaintiff. (UF 52-54.) Further, it is undisputed that Plaintiff's Mintox antacids interfere with the absorption of antipsychotic medications such as Thorazine, rendering them less effective. (UF 25.) Therefore, even if a prison official injected Plaintiff's antacids with these medications, the injected medications would be rendered nearly completely ineffective. (UF 22, 37.) In addition, Plaintiff was undergoing treatment for Hepatitis C during May 2018 and has a long history of GERD. (UF 6, 8, 9, 26.) The symptoms that Plaintiff experienced can be attributed to his diagnosis and treatment for Hepatitis C and/or GERD, rather than food tampering. (UF 6, 8, 9, 21, 26.) Furthermore, Plaintiff did not demonstrate any symptoms consistent with ingestion of antipsychotic medications when evaluated by medical staff, nor did he complain of any symptoms. (UF 11-13, 16.) There is also evidence that Plaintiff likely experiences paranoia and delusions from his extensive history of drug use. (UF 14.)

Plaintiff has failed to provide any evidence in support of his opposition, and his statement that Defendant Gonzalez placed mediations in his food is conclusory and does not provide specific information relating to the medications involved, the color or form of the medications, and the dates or manner in which they were alleged to have been placed in his food. (ECF No. 59 at 1.) Rather, Plaintiff's opposition consists of a one-page document entitled "objections to summary judgment," containing only conclusory assertions. Although Plaintiff contends that the medications placed in his food by Defendant Gonzalez caused Tardive Dyskinesia, his statement is conclusory and fails to provide information regarding the symptoms he experienced, when he experienced the symptoms, or whether the symptoms were consistent with Tardive Dyskinesia. Plaintiff cannot create a genuine issue of disputed fact by claiming that his symptoms could only be caused by anti-psychotic drugs as such statement is improper lay opinion. Fed. R. Evid. 701(c).

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. Defendant's motion for summary judgment be granted; and
2. The Clerk of Court be directed to enter judgment in favor of Defendant Gonzalez.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **November 22, 2021**

UNITED STATES MAGISTRATE JUDGE